| | | |
|---|---|---|
| **MICHELE L. RICH,** | : | |
| | : | |
| **Plaintiff** | : | **No. 3:11-CV-01778** |
| | : | |
| **vs.** | : | **(Judge Kosik)** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **ACTING COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

**Background**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michele L. Rich's claim for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Rich met the insured status requirements of the Social Security Act through March 31, 2005. Tr. 19, 22 and 79.[1]

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on December 5, 2011.

In order to establish entitlement to disability insurance benefits, Rich was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

On October 7, 2005, Rich protectively filed[2] an application for disability insurance benefits and on May 22, 2007, an application for supplemental security income benefits. Tr. 19. 57, 79, 91-95 and 137.[3] On November 30, 2007, the Bureau of Disability Determination[4] denied Rich's applications. Tr. 19.

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 5, 2011.

4. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.

On January 30, 2008, Rich requested a hearing before an administrative law judge. Id. An administrative hearing was held on July 28, 2008. Tr. 834-853. After more than one year had elapsed, the administrative law judge on August 25, 2009, issued a decision denying Rich's application for disability insurance benefits but found that Rich was disabled for purposes of supplemental security income benefits as of May 22, 2007. Tr. 19-26. The administrative law judge found that prior to May 22, 2007, Rich could engage in the full range of light work as defined in the regulations of the Social Security Administration. Tr. 22. On September 1, 2009, Rich requested that the Appeals Council review the administrative law judge's decision. Tr. 12-13. After almost 2 years had elapsed, the Appeals Council on August 2, 2011, concluded that there was no basis upon which to grant Rich's request for review. Tr. 5-9. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.[5]

Rich then filed a complaint in this court on September 6, 2011. Supporting and opposing briefs were submitted and the

---

5. Missing from the administrative record in this case are several documents, including notices dated November 30, 2007, from the Social Security Administration, indicating that Rich's applications were initially denied and the application for supplemental security income benefits protectively filed on May 22, 2007. In reviewing in this memorandum the administrative procedural history, we are relying to a great extent on the dates set forth in the administrative law judge's decision.

appeal[6] became ripe for disposition on May 2, 2012, when Rich filed a reply brief.

Rich, who was born in the United States on November 12, 1973, withdraw from school while attending the 11th grade. Tr. 91, 137 and 251. Rich stated in documents filed with the Social Security Administration that she can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook. Tr. 118 and 141. During her elementary and secondary schooling, Rich attended regular education classes. Tr. 148. After withdrawing from school, Rich obtained a General Equivalency Diploma in 2002. Id. Rich has not completed any type of job training. Id.

Rich has past relevant employment[7] as a cashier at a grocery store, a driver at a car auction and a bartender at a social club. Tr. 106 and 156. The description of these positions

---

6. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

7. Past relevant employment in the present case means work performed by Rich during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

by Rich indicates they were in the light work category.[8]  Tr. 106-

113.

---

8.  The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work*. Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

Records of the Social Security Administration reveal that Rich had reported earnings in the years 1990 through 2000, 2003 and 2004. Tr. 80-82. Rich's total earnings during those 13 years were $50,582.53. Id. Rich's work and earnings amounted to substantial gainful activity only in 2 of those years - 1994($8983.45) and 1997($9256.01).[9] Rich's annual earnings ranged from a low of $175.18 in 1990 to a high of $9465.50 in 2003. Id. In 2004, her earnings were $2434.45. Id. Rich has no reported earnings after 2004. Id.

Rich claims that she became disabled on June 19, 2004, because of physical and mental impairments. Tr. 142 and 155. The physical impairments alleged are fibromyalgia and arthritis. Id. The mental impairments alleged are bipolar disorder, depression, panic disorder and anxiety. Id. Rich claims that chronic pain, fatigue, anxiety, panic attacks and concentration and memory problems prevent her from engaging any type of work on a full-time basis. Id.

For the reasons set forth below, we will remand this case to the Commissioner for further proceedings.

---

9. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity. The official website of the Social Security Administration reveals that in 1990 through 1998 the amount was $500 per month ($6000 per year); in 2003 the amount was $800 per month ($9600 per year); and in 2004 the amount was $810 per month ($9720 per year). Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed April 26, 2013).

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565

(1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197,

229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d

198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360

(3d Cir. 1999). Substantial evidence has been described as more

than a mere scintilla of evidence but less than a preponderance.

<u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the

weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by

substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383

U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all

the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and

"must take into account whatever in the record fairly detracts

from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S.

474, 488 (1971). A single piece of evidence is not substantial

evidence if the Commissioner ignores countervailing evidence or

fails to resolve a conflict created by the evidence. <u>Mason</u>, 994

F.2d at 1064. The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642

F.2d at 706-707. Therefore, a court reviewing the decision of the

Commissioner must scrutinize the record as a whole. <u>Smith v.</u>

Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

9

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and

(continued...)

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary

---

11. (...continued)
416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

work setting on a regular and continuing basis.  <u>See</u> Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment must
include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R.
§§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

**DISCUSSION**

The administrative record in this case is 853 pages in
length and we have thoroughly reviewed that record.

The relevant periods of time under review are from the
alleged onset date of June 19, 2004, through March 31, 2005, the
date last insured, and from that date through May 21, 2007, which
is the day before the administrative law judge found that Rich was
disabled.

Rich argues, *inter alia*, that the administrative law
judge erred by failing to appropriately evaluate the medical and
psychiatric evidence and by relying on the assessment of a non-
medical state agency adjudicator when setting Rich's residual

functional capacity for the period prior to May 22, 2007 and March 31, 2005. Those arguments have substantial merit.

The administrative law judge went through the 5-step sequential evaluation process and determined that Rich, prior to May 22, 2007, had the ability to engage in the full range of light work and that she could perform her prior relevant work as a bartender, clerk and cashier.[14] Tr. 24. The administrative law judge at step two found that Rich, prior to May 22, 2007, had the severe impairment of fibromyalgia. Beginning on May 22, 2007, the administrative law judge found that Rich suffered from the severe impairments of bipolar disorder, anxiety disorder, personality disorder and fibromyalgia. Tr. 22. The administrative law judge, however, did not address whether prior to May 22, 2007, Rich had any non-severe mental or physical impairments. The record strongly suggests that Rich had a longstanding history of depression and mental health problems prior to the date last insured and the administrative law judge did not make a determination as to what non-severe mental health impairments Rich suffered from prior to March 31, 2005, the date last insured, as well as May 22, 2007. Tr. 429-431. The record reveals that Rich's mental health history includes several suicide/cutting

---

14. A vocational expert did not testify at the administrative hearing.

incidents, e.g., on October 21, 2006, Rich was hospitalized for cutting her left wrist with a knife. Tr. 201-202.

On October 11, 2005, Rich was evaluated by Anjana Dhamodharan, M.D., and Richard J. Fonte, M.D., psychiatrists at the Milton S. Hershey Medical Center. Tr. 429-431. These psychiatrists noted Rich's longstanding history of depression and that she had been treated for her depression by her primary care physicians with the psychotropic drugs Zoloft, Wellbutrin and Celexa. Tr. 429. After conducting a clinical interview and a mental status examination, Rich was found to be suffering from panic disorder with agoraphobia, major depressive disorder, severe without psychotic features and was given a Global Assessment of Functioning (GAF) score of 40.[15]

Rich was treated for fibromyalgia by John J. Messmer, M.D., at the Hershey Medical Center since at least early December 2006. Tr. 186. Dr. Messmer's treatment notes indicate that Rich

_____

15. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id.

had previously been treated for fibromyalgia, and as stated above, the ALJ in fact found that Rich had severe fibromyalgia since the alleged onset date of June 19, 2004. Tr. 24 and 186.

On July 1, 2008, Dr. Messmer completed a document on behalf of Rich entitled "Medical Source Statement Regarding the Nature and Severity of Medical Impairments with Respect to Work-Related Physical Activities." Tr. 382-383. In that document, Dr. Messmer indicates that Rich is unable to engage in full-time sedentary employment because of bipolar disorder, panic disorder and fibromyalgia and that her work limitations have existed since before March 31, 2005. Id.

Rich was treated for her mental health problems by several psychiatrists, including Nhien D. Nguyen, M.D. Tr. 97, 99, 145, 147, 202, 390-407, 416, 841 and 849. On July 15, 2008, Dr. Nguyen completed a document on behalf of Rich entitled "Medical Statement Regarding the Nature and Severity of Medical Impairment(s)." Tr. 384-385. Out of sixteen areas of mental functioning, Dr. Nguyen indicated that Rich had marked limitations in six (including in her ability to make simple work-related decisions) and extreme limitations in seven (including her ability to complete a normal workday or workweek). Tr. 384. "Marked" was defined as "[u]nable to function independently, appropriately, effectively, and on a sustained basis." Id. "Extreme" was defined

15

as "[n]o useful ability." Id. Dr. Nguyen further stated that Rich's limitations existed for the last 4 years which would place the commencement of the limitations before Rich's date last insured. Tr. 385.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security

regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

As noted above, the record reveals that in addition to the conditions found by the ALJ, Rich prior to May 22, 2007 suffered from depression and anxiety. The failure of the administrative law judge to find those conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes the ALJ's decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Rich. The administrative law judge found that Rich's medically determinable impairments could reasonably cause Rich's alleged symptoms, but that Rich's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge

was based on an incomplete and faulty analysis of all of Rich's medically determinable impairments.

The administrative law judge rejected the opinions of Dr. Messmer and Dr. Nguyen. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social

Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In rejecting the opinions of Dr. Messmer and Dr. Nguyen, the administrative law judge engaged in inappropriate lay analysis of the medical records. Also, in rejecting the opinions of the treating physicians, the administrative law judge relied on what she referred to as the opinion of a state agency consultant who after reviewing Rich's medical records found that Rich could work at the light exertional level. Tr. 23-24. However, this was a legal and factual error because the individual, Janeen Oliver, who reviewed Rich's medical records was not a physician, but a non-medical state agency adjudicator. Tr. 259-265.

This court has repeatedly found such statements from non-medical disability adjudicators insufficient evidence of a claimant's residual functional capacity. See, e.g., Ulrich v. Astrue, Civil No. 09-803, slip op. at 17-18 (M.D.Pa. December 9, 2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662, slip op. at 15 (M.D. Pa. December 23, 2010)(Muir, J.); Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16 (M.D.Pa. January 11, 2011)(Muir, J.); Peak v. Astrue, Civil No. 10-889, slip op. at 25 (M.D.Pa. January 24, 2011)(Muir, J.); see also Dutton v. Astrue, Civil No.

10-2594, slip op. at 22 n. 32(M.D.Pa. January 31, 2012)(Munley, J.)

With respect to the reliance on a form completed by the state agency disability adjudicator, administrative law judges have been instructed to accord such documents no evidentiary weight. See Doc. 12, pages 14-15 in Edwards v. Astrue, Civil No. 10-126 (M.D.Pa.)(quoting a memorandum from the Chief Administrative Law Judge stating the policy of Social Security Administration prohibits Administrative Law Judges from according any weight to forms completed by the non-medical state agency disability examiners).

Finally, the ALJ rejected the opinion of George S. Bell, M.D., a medical expert in psychiatry, who was called by the ALJ to testify at the administrative hearing. Tr. 25. Dr. Bell when questioned about the commencement of Rich's impairments placed the commencement "well before 2006 even without the records."[16] Tr. 840. The ALJ failed to point to any contrary medical opinion evidence in the record when rejecting the opinions of Dr. Messmer, Dr. Nguyen and Dr. Bell.

---

16. The ALJ in questioning Dr. Bell pointed out there were no medical records in the file earlier than November 2006 and inquired how Dr. Bell could relate back those records two years. Tr. 839. Dr. Bell responded by saying that bipolar disorder and and personality disorder "certainly didn't just start in November 2006." Id.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.

An appropriate order will be entered.